REINHARDT, Circuit Judge,
dissenting:
At a time when Congress is expanding the jurisdiction of the federal courts over national class-action lawsuits, see 28 U.S.C. § 1332(d), the majority’s decision severely limits the authority of district courts to protect that jurisdiction and to preserve the settlement agreements they have authorized. It renders federal court orders and judgments vulnerable to further litigation in state courts on a state-by-state basis, litigation that can reopen what are intended to be final damage awards and undermine the orderly implementation of complex national settlement agreements. Further, it allows parties and third parties alike to circumvent federal class-action orders by relying on state law claims that contravene the specific provisions of such orders.
The specific question is whether a federal court may enjoin entry of a final judgment by a state court when the state court jury awards damages that are barred by a federal court settlement agreement and the district court order and judgment adopting it. There is no dispute that if one of Lester’s customers had sued Louisiana-Pacific in a Minnesota state court seeking the recovery of funds to make repairs covered by the settlement agreement, an injunction would have been appropriate. The only difference between that case and the one before us is that Lester’s customers did not sue Louisiana-Pacific directly. Instead, the action was filed by Lester which sought to recover funds from Louisiana-Pacific on its customers’ behalf and for their benefit. Lester assured the jury that the funds would be used to make repairs to the customers’ buildings, the very same repairs for which funds are provided to those same customers under the settlement agreement. The majority views the difference in plaintiffs *857 as dispositive. I view it as immaterial. In effect, the majority condones a double recovery by a sub-group of class members in direct contravention of the settlement agreement and encourages the proliferation of similar sub-groups and similar lawsuits in other states. In light of these circumstances, it is difficult to comprehend why the majority concludes that the district court erred when it enjoined the Minnesota state court from entering judgment on the portion of the state jury’s verdict that provided for the double recovery.
I.
In 1996, the district court approved a nationwide class settlement of a number of consolidated lawsuits alleging damages resulting from serious defects in Inner-Seal Siding, a product of the Louisiana-Pacific Corporation. In the settlement agreement and the order approving it, the district court retained “exclusive and continuing” jurisdiction over any claim which in any way relates to any defect or alleged defect of Inner-Seal Siding that could reasonably be asserted by a class member and brought against Louisiana-Pacific in any court or forum, regardless of legal theory. The national class was composed of all individuals who owned or acquired a building that had Inner-Seal Siding installed prior to January 1, 1996. In return for Louisiana-Pacific’s agreement to pay a then-undetermined amount of damages (which according to a special master’s report dated November 17, 2003 involves claims in excess of $820 million), class members released it from all claims associated with their use of Inner-Seal Siding. They also fully released any entities within the chain of distribution for Inner-Seal Siding. Among the distributors enjoying this collateral benefit of the settlement is the appellant, Lester, a manufacturer of hog barns. The agreement was formally approved by court order.
Despite the release it was granted by its customers in the settlement agreement, Lester sued Louisiana-Pacific in a Minnesota state court. Among the damages it sought, and the jury awarded, was the cost of repairs to its customers’ buildings necessitated by the use of Inner-Seal Siding during the period covered by the settlement agreement. Lester’s evidence at the state court trial was that the full cost of repairs to all of its customers’ hog barns was $13.2 million, approximately $2 million of which was for barns built after January 1, 1996, and therefore not covered by the settlement agreement and order. The trial judge instructed the jury that although Lester was not a party to the settlement agreement, recovery on any claims for the cost of repairs to the buildings built prior to January 1, 1996 (during the period covered by the agreement) was barred, with two exceptions that are not relevant here. The jury nevertheless returned a verdict awarding Lester the full $13.2 million for the “Cost to Repair Buildings (those not barred by the class action)” (emphasis added). However, when asked on the special verdict form “[wjithout regard to the class action, what is the total money that would fairly and adequately compensate Lester for the Cost to Repair Buildings (both those in and out of the class action)?” (emphasis added), the jury responded with the same figure — $13.2 million. In view of the evidence introduced by the plaintiffs, it is clear that, although the jury offered conflicting and inconsistent answers to the questions it was asked, the $13.2 million portion of the verdict it returned included both the $11.2 million in damages barred by the settlement agreement and the approximately $2 million for the period not covered by the agreement. In short, the jury awarded Lester compensation for the cost of repairs to all its customers’ hog *858 barns and not merely for the cost of those that were not covered by the terms of the settlement agreement.[1]
Because Lester’s customers would receive a double recovery, the district court permanently enjoined entry of judgment in the state court on $11.2 million of the jury’s verdict, ie., that portion of the verdict awarding Lester damages for the cost of repairs to its customers’ hog barns during the period covered by the settlement agreement and court order. The majority now holds that the jury’s verdict does not constitute a threat to the district court’s “exclusive and continuing” jurisdiction, that the district court may not set aside the verdict in aid of its jurisdiction over the implementation of the settlement, that the injunction is not necessary to protect the settlement and the court order, that the injunction is not authorized under the relitigation exception to the Anti-Injunction Act, and that Lester’s interests in the state court action are not parallel to or in privity with those of its customers who are class members. I strongly disagree in all respects.
II.
Under the All Writs Act, a district court may “issue all writs necessary or appropriate in aid of [its] respective jurisdiction[ ] and agreeable to the usages and principles of law.” 28 U.S.C. § 1651. The district court’s power to issue an injunction against proceedings in a state court is limited by the Anti-Injunction Act which prohibits a federal court from enjoining state court proceedings “except as expressly authorized by ... Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments.” 28 U.S.C. § 2283. The interplay of the two Acts is well established in the federal courts. As we have explained, under the Acts an injunction is appropriate when (1) Congress has expressly authorized it; (2) it is necessary in aid of the federal court’s jurisdiction; or (3) it is necessary to protect or effectuate the federal court’s judgments. See Bennett v. Medtronic, Inc., 285 F.3d 801, 805 (9th Cir.2002). When any of these exceptions to the Anti-Injunction Act is present, the district court may issue an injunction, but it is not required to do so. See Chick Kam Choo v. Exxon Corp., 486 U.S. 140, 151, 108 S.Ct. 1684, 100 L.Ed.2d 127 (1988). The decision to issue the injunction is committed to the sound discretion of the district court, Blalock Eddy Ranch v. MCI Telecom. Corp., 982 F.2d 371, 375 (9th Cir.1992), and its exercise is reviewed for an abuse of that discretion. See Western Sys., Inc. v. Ulloa, 958 F.2d 864, 867-68 (9th Cir.1992). The majority acknowledges that it is required to apply an abuse of discretion standard in reviewing a district court’s exercise of its discretion to grant an injunction. Under that standard, a reviewing court cannot reverse the trial court unless it has a definite and firm conviction that the lower court committed a clear error of judgment in the conclusion that it reached upon a weighing of the relevant factors, see United States v. Finley, 301 F.3d 1000, 1007 (9th Cir.2002), or that the lower court’s conclusion was based on an error of law. See Western Sys., Inc. v. Ulloa, 958 F.2d 864, 867-68 (9th Cir.1992). The majority also acknowledges, as it must, that factual findings underlying the district court’s decision to grant the injunction are reviewed for clear error. See Scott v. Pasadena *859 Unified Sch. Dist., 306 F.3d 646, 653(9th Cir.2002).
Despite these acknowledgments, the majority impermissibly conducts a de novo review of the district court’s ruling that the injunction was appropriate under both the second and third exceptions to the Anti-Injunction Act. The majority may be correct that the district court’s ruling with respect to the third exception turned purely on a question of law — whether Lester was in privity with its class-member customers — and thus was subject to de novo review. However, the majority’s complaint regarding the district court’s reliance on the second exception is based entirely on the majority’s factual analysis of the effect of the Minnesota verdict upon the court’s continuing jurisdiction over the federal action. This is essentially a factual dispute involving the exercise of judgment by the district judge. There is simply no allegation by the majority that the district court erred in its legal conclusions, that it exercised its discretion to an end not justified by the evidence, or that its judgment was clearly against the logic and effect of the facts as they were found. See Rabkin v. Or. Health Sciences Univ., 350 F.3d 967, 977 (9th Cir.2003). Instead of applying a deferential standard, the majority conducted a de novo review of the factual findings underlying the district court’s decision to issue the injunction under the second exception and substituted its judgment for that of the district court. This, it may not do. Scott, 306 F.3d at 653. Regardless, however, of the standard applied, the majority plainly erred in reversing the district court’s decision to issue an injunction on the bases of both the second and third exceptions to the Anti-Injunction Act.
III.
I will discuss the second and third exceptions to the Anti-Injunction Act in reverse order, starting with the rule that injunctions may be issued when “necessary to protect or effectuate federal court judgments.” That exception is also known as the relitigation exception. It “was designed to permit a federal court to prevent state court litigation of an issue that was previously presented to and decided by a federal court.” G.C. & K.B. Invs., Inc. v. Wilson, 326 F.3d 1096, 1107 (9th Cir.2003) (citation omitted). The district court issued the injunction under the relitigation exception-on the ground that “by permitting Lester to pursue to verdict claims for damages plainly covered by the class action settlement, the Minnesota court allowed relitigation of issues already presented to and decided by this court many years ago.” In re Louisiana-Pacific Inner-Seal Siding Litig., 234 F.Supp.2d 1170, 1180 (D.Or.2002). The majority disagrees primarily for the reason that “Lester was not named as a party to the class action and was not a member of the nationwide class. Nor were Lester’s interests sufficiently parallel to the class members’ interests such that privity could be implied.” Maj. op. at 848 (citations and footnotes omitted). The first reason is irrelevant and the latter is contrary both to the facts in the record and to indisputable principles of law.
There is no question that the Minnesota state court verdict involved the relitigation of issues that had been resolved by the settlement agreement. The settlement agreement covers
any claim, [liability, right, demand, suit, matter, obligation,] damage, loss or cost, action or cause of action, of every kind and description that the Releasing Party [as defined] has or may have, whether known or unknown, asserted or unas-serted, latent or patent, that is, has been, could reasonably have been or in the future might reasonably be asserted *860 by the Releasing Party either in the Action or in any other action or proceeding in this Court or any other court or forum, regardless of legal theory, and regardless of the type or amount of relief or damages claimed, against any of the Defendants, arising from or in any way relating to any defects or alleged defects of [Inner-Seal Siding], or any part thereof.
In re Louisiana-Pacific, 234 F.Supp.2d at 1172(quoting the settlement agreement) (emphasis added). The scope of the agreement is broad and comprehensive. It resolves any claim, damage, loss, or cost which in any way relates to any defect or alleged defect of Inner-Seal Siding that might reasonably be asserted by any class member and brought against Louisiana-Pacific in any court or forum, regardless of legal theory. The effect of the settlement agreement is to bar any future claim for the same damage, loss, or cost, including principally the cost of repairs arising from any defect in Inner-Seal Siding.
In March, 2000, Lester filed an action in Minnesota state court seeking to recover damages for numerous injuries, specifically including the cost to its customers of repairing their buildings covered by the settlement agreement. When the ease went to trial, Lester offered evidence that the removal and replacement of Inner-Seal Siding on all of its customers’ hog barns would cost $13.2 million, with approximately $2 million of that amount being allocated to barns built after January 1, 1996, and therefore not covered by the settlement agreement. Despite the trial judge’s instruction to award damages only for the cost of repairing barns not covered by the settlement agreement, the jury returned a verdict covering the costs of repairing all the barns, both those covered by the settlement agreement and those outside its scope. Thus, instead of awarding Lester only the $2 million it. sought for barns constructed post-January 1, 1996, it also awarded an additional $11.2 million for the cost of repairs to the settlement agreement barns. As a result, the jury’s verdict conflicts directly with the settlement agreement and federal court order, and it may properly be enjoined. We have stated the rule plainly: “A district court may properly issue an injunction under the re-litigation exception if ‘there could be an actual conflict between the subsequent state court judgment and the prior federal judgment.’ ” G.C. & K.B. Invs., 326 F.3d at 1107(quotations omitted).
The majority asserts that the issue of the jury’s disregard of the trial judge’s instruction is a matter for the state courts to resolve.[2] Although the question of the effect on the state court proceedings of the jury’s disregard of the instruction may be a matter for the state courts, the question whether the verdict the jury returned is consistent with the settlement agreement and the federal court order is a federal question. See In re Agent Orange, 996 F.2d 1425, 1431 (2d Cir.1993) (“The court best situated to make this determination [as to the scope of the settlement agreement] is the court that approved the settlement and entered the judgment enforcing it.”). For purposes of the relitigation exception, there is no difference between a verdict that results from the jury’s disregard of the court’s instruction and one in which the instruction was not given at all. In either case, entry of final judgment on the verdict as returned by the Minnesota *861 jury would have the impermissible effect of allowing the circumvention of the settlement agreement and the receipt of duplicate damages and costs that are directly covered by it. See In re Louisiana-Pacific, 234 F.Supp.2d at 1180. In both cases, the intrusion into the district court’s domain by the state court is the same; the potential judgment constitutes a serious threat to the court’s ability to protect its settlement agreement and, accordingly, the district court is authorized to prevent its entry.
The majority concludes that even if the jury’s disregard for the settlement agreement is not a question for the state courts alone, the Minnesota verdict does not conflict with the settlement agreement because “the prayer for repair costs presented a cognizable state law claim belonging to Lester.” Maj. op. at 849. Lester argues, and the majority agrees, that notwithstanding the settlement agreement and notwithstanding the trial court’s instruction, the $11.2 million award for repair costs that Lester received was an award to which Lester was entitled under Minnesota law. Once again, the fundamental problem with this argument is that whether or not Lester had a “cognizable state law claim” is inconsequential to the question we must decide — whether the jury’s award is inconsistent with the settlement agreement. There can be no doubt that it is. The jury awarded damages for the very same repair costs previously provided for in the settlement agreement and district court order. In doing so, it stripped Louisiana-Pacific of the protection against further liability that lies at the heart of the settlement agreement. The jury’s verdict is in direct conflict with that agreement and with the federal court order.
The settlement agreement completely resolved the issue of liability for any damage, loss, or cost incurred by Lester’s customers as a result of their use of Inner-Seal Siding. Even if the majority were correct that Lester’s “cognizable state law claim” was not itself litigated in the class action, the fact that the issue on which that claim relies has been fully litigated in federal court is sufficient justification for the district court’s injunction. See Chick Kam Choo, 486 U.S. at 147, 108 S.Ct. 1684(stating that the relitigation exception is “designed to permit a federal court to prevent state litigation of an issue that previously was presented to and decided by the federal court”). If enterprising litigants like Lester were allowed to relitigate claims covered by the settlement agreement merely by alleging them as a matter of a particular state’s law, “the finality of virtually any class action ... could be defeated by subsequent suit brought by [parties] asserting rights derivative of those released by the class members.” In re Baldwin-United Corp., 770 F.2d 328, 336 (2d Cir.1985).
Here, of course, not only was the issue of the compensation for the cost of repairs due to the owners of barns built with Inner-Seal Siding fully litigated and resolved by the settlement agreement, but the state court jury awarded Lester substantial damages for the purpose of making the same repairs already paid for by Louisiana-Pacific under the damage award in that agreement. In the absence of the injunction, this double recovery would have occurred notwithstanding the district court’s 1996 order and judgment, under which the class settlement damages were intended to be the only damages Louisiana-Pacific would be required to pay on account of the harm to the barns involved. The Second Circuit has held, in an important and highly persuasive opinion, that the issuance of an injunction is appropriate in such circumstances. In In re Baldwin-United Corp., thirty-one states that were *862 not parties to a federal court settlement against a group of securities broker-dealers were enjoined from bringing state court actions against the dealers where the damages sought by the states were intended to be paid over to persons who were parties to the settlement agreement. See In re Baldwin-United Corp., 770 F.2d at 337. The Second Circuit upheld the injunction, stating, “[i]f the states or others could derivatively assert the same claims on behalf of the same class members or members of it, there could be no certainty about the finality of any federal settlement. ... The effect would be to threaten to reopen the settlement....” Id. In short, the Second Circuit warned, the same claims could be relitigated in every state and the district court judgment would be indeterminate.
As in In re Baldwin-United Corp., the finality of the district court’s order and judgment are in jeopardy in the case before us. The settlement agreement would be meaningless if distributors or others in the chain of distribution, like Lester, could circumvent the federal judgment by filing suit in their own name, and then recover damages for the benefit of their class member-customers. Had the verdict been entered as returned, Louisiana-Pacific would have been required to pay Lester $11.2 million to make repairs for its customers who had already been compensated for the damage they suffered and, thus, contrary to the settlement agreement, would, unlike all other class members, receive double compensation for the damage to their barns. I can conceive of no reason why entry of a verdict cannot be enjoined when a state court jury awards money to compensate a party for loss or damage for which that party has already been compensated under a settlement agreement in federal court — an agreement expressly designed to provide the exclusive remedy for those damages. In fact, “[e]ven if no actual conflict is possible, an injunction could still be proper if res judicata would bar the state court proceedings.” G.C. & K.B. Invs., 326 F.3d at 1107(quotations omitted).[3]
Lester clearly sought a double recovery for its customers. As a result of the settlement agreement, Lester had no liability to its vendees and no risk associated with potential lawsuits by them. Thus, the *863 award for “Cost to Repair Buildings” covered by the settlement agreement could not result from any damage Lester suffered. Accordingly, the only recovery Lester could have sought was 'on behalf of its customers. We need not speculate on this point, however. At trial in the Minnesota state court, Lester’s president testified. He told the jury that the company sought damages to “fix these buildings” and to get each customer “what he’s entitled to.” Lester’s “Cost to Repair Buildings” damage award was undeniably made for the purpose of satisfying the same claims resolved by the class settlement. This is why the Minnesota court gave the instruction that the jury disregarded: any claim for damages covered by the settlement agreement was barred. The $11.2 million enjoined by the district court was awarded solely for the damage to Lester’s customers’ property, not Lester’s. There can be no dispute that the $11.2 million enjoined by the district court is an award for the benefit of the class member-customers, and not for the benefit of Lester.
The majority attempts to avoid the problem posed by double recovery on the basis that Lester was not a party to the class action. It asserts that compensating Lester so that it may pay the costs of repairing its customers’ hog barns is somehow different from compensating Lester’s customers directly. However, because Lester seeks recovery for the same damage, loss, or cost that has already been paid to its customers under the settlement agreement, and because Lester is simply serving as a conduit for the obtaining of additional compensation for those same customers for that same harm, it is irrelevant that Lester was not itself a party to the settlement agreement. The terms of the settlement agreement clearly provide that the fund it establishes shall be the exclusive source of relief for class members and shall fully resolve any damage, loss, or cost to those class members. Whether the jury’s award is given to Lester’s customers or to Lester for the benefit of its customers, Louisiana-Pacific would be required under the prospective state court judgment to pay double compensation in order to remedy the harm for which it had already paid the agreed-upon compensation. Regardless of Lester’s lack of participation in the federal case, the jury’s award is inconsistent, with the settlement agreement.
That a non-party may be precluded from relitigating in state court an issue already decided in federal court is well established in federal law. InIn re Baldwin-United Corp., the thirty-one States Attorneys General who brought the action sought “to enforce state laws authorizing them in their representative capacities to seek restitution and monetary recovery from the defendants to be paid over to those of the states’ citizens who are plaintiffs in the consolidated class actions.... ” 770 F.2d at 332-33. The states were, like Lester, beneficent strangers to the class settlement and possessed a cognizable state law claim. They argued, like Lester, that they were not barred by the settlement agreement from obtaining a recovery in their own right, albeit for the benefit of class members. They acknowledged that their intent was “to pursue remedies in the state[s’] name[s]” by “tak[ing] back the restitution that consumers deserve.” Id. at 332 n. 1. For this reason, they claimed that any damages received by the states would not constitute a “double recovery,” even though the class members would be the ultimate beneficiaries. Id. The Second Circuit upheld the district court’s injunction on the ground that
no defendant in the consolidated federal actions ... could reasonably be expected to consummate a settlement of those claims if their claims could be reasserted *864 under state laws, whether by states on behalf of the plaintiffs or by anyone else, seeking recovery of money to be paid to the [class] plaintiffs. Whether a state represented itself to be acting as a ‘sovereign’ in such a suit or described its prayer as one for ‘restitution’ or a ‘penalty’ would make no difference if the recovery sought by the state was to be paid over to the [class] plaintiffs.
Id. at 336-37 (emphasis added). The court’s holding was not dependent upon any finding that the states were in privity with class members. Nor did the court find it relevant that the states were authorized to file their action under applicable state laws or that they asserted a “cognizable state law claim.” Whether Lester was a party to the settlement agreement or was in privity with any such party is beside the point. The jury’s verdict can be enjoined simply because it awards additional damages to be used for the benefit of class members in satisfaction of claims for which they have already been compensated under the settlement agreement. The fact that a third party brings the action in its own name is without consequence. In re Baldwin-United Corp. is the leading case in the area; it is correct, and there is no reason to create a direct conflict with it.
The majority contends, nevertheless, that privity is necessary for a non-party to be bound by the settlement agreement. See Maj. op. at 848 n.24. Even if it is, the district court’s order would stand. Privity “is a legal conclusion designating a person so identified in interest with a party to former litigation that he represents precisely the same right in respect to the subject matter involved.” United States v. Schimmels (In re Schimmels), 127 F.3d 875, 881 (9th Cir.1997) (quotation marks and citation omitted). Although privity was originally reserved for specific relationships such as indemnitors and indemni-tees, we have noted that “[rjecent cases apply the privity concept in a much more flexible manner ... and courts have found the existence of privity in an array of disparate circumstances summarized under the heading of ‘virtual representation.’ ” See Kourtis v. Cameron, 419 F.3d 989, 996 (9th Cir.2005). An example of one such relationship is where a party to a pending action has “sufficiently similar interests” to a non-party that litigated the same issue in a prior action. See Trevino v. Gates, 99 F.3d 911, 924 (9th Cir.1996) (holding that a child who filed an action seeking punitive damages as the result of the killing of her father was in privity with her grandmother who earlier sued concerning the same events, because the grandmother had a “tremendous incentive” to recover punitive damages); United States v. ITT Rayonier, Inc., 627 F.2d 996, 1003(9th Cir.1980) (“Courts have recognized that a non-party may be bound if a party is so closely aligned "with its interests as to be its ‘virtual representative.’ ” (citation omitted)).
The majority simply asserts that Lester’s interests were not “parallel” to those of the class members and, thus, they were not in privity. It provides no explanation as to why Lester’s claim for an award of “Cost to Repair Buildings” owned by class members and covered by the settlement agreement is not parallel to those of the class members themselves. Lester simply sought to obtain a further recovery for the same injury suffered by the class members, with the intention of passing the recovery along to those members. In essence, Lester sought to serve as a conduit for its customers by obtaining additional damages on their behalf. The privity here is far stronger than in Trevino where the grandmother and granddaughter each sought separate recoveries for their own *865 benefit.[4] Certainly, the class members here had a “tremendous incentive” to recover the damages that Lester later sought on their behalf. See Trevino, 99 F.3d at 924. Certainly, Lester and its customers had “sufficiently similar interests.” See id. Accordingly, I conclude that Lester has no greater, or different, interest in the “Cost to Repair Buildings” covered by the settlement than did its customers, and that Trevino, which binds us, compels the affirmance of the district court’s injunction.
Although Lester may not have had a full opportunity to litigate its customers’ claims in the federal court, its customers themselves adequately represented any interest that Lester might have had in seeing that its customers’ hog barns were repaired. See ITT Rayonier, 627 F.2d at 1003. As such, Lester’s interests and those of its customers are absolutely parallel and Lester’s interests were fully represented and vigorously pursued by the customers during the settlement proceedings. See Schimmels, 127 F.3d at 881; Trevino, 99 F.3d at 924. Accordingly, Lester is in privity with its customers and is barred from receiving the portion of the jury’s verdict that would compensate its customers twice for the cost of the same repairs. See In re Baldwin-United Corp., 770 F.2d at 336; TBK Partners, Ltd. v. Western Union Corp., 675 F.2d 456, 460-62 (2d Cir.1982) (holding that claims based on the “identical factual predicate” as those covered by the settlement agreement were barred by a prior judgment on the settlement). The district court did not err when it issued the injunction pursuant to the relitigation exception.
IV.
The district court also based its injunction on the second exception to the Anti-Injunction Act, injunctions that are “necessary in aid of [ ] jurisdiction.” 28 U.S.C. § 2283. Regarding that exception, the district court held that:
[I]n the exercise of my discretion [I] conclude that the requested injunction is proper and should issue. ... [Allowing Lester’s case in Minnesota to proceed would] circumvent the settlement agreement and the elaborate negotiated claims resolution procedures contained therein, and create, as [Louisiana-Pacific] suggests, a “subclass” of class members whose claims would, if the jury verdict is permitted to stand, enjoy special treatment not available to other class members. Moreover, there is a substantial risk that others in Lester’s position, encouraged by the jury verdict, will pursue similar claims, thus further impairing the class action settlement and interfering in this court’s stewardship over it.
In re Louisiana-Pacific, 234 F.Supp.2d at 1180. As the district court’s ruling demonstrates, the “necessary in aid of jurisdiction” exception is quite similar to the reliti-gation exception, and in some respects, overlapping. From a pragmatic standpoint, the basic elements of the two exceptions are essentially the same. The princi *866 pal difference is that the former exception is generally applied at an earlier stage of the litigation, before the settlement is fully implemented. Nevertheless, in many cases in which an injunction has been affirmed under the relitigation exception, it has also been affirmed under the “necessary in aid of jurisdiction” exception. See, e.g., Flanagan v. Arnaiz, 143 F.3d 540, 545-46(9th Cir.1998); Battle v. Liberty Nat’l Life Ins. Co., 877 F.2d 877, 881-83 (11th Cir.1989) (holding that both exceptions applied where a judgment pursuant to a settlement agreement in federal court was entered five years prior to the enjoined state court action, and the federal court had retained jurisdiction for the purpose of construing and implementing terms of the settlement); United States v. Am. Soc’y of Composers, Authors & Publishers, 442 F.2d 601, 603 (2nd Cir.1971). Thus, to the extent that I have already responded to the majority’s arguments in discussing the relitigation exception, I will not reiterate that analysis here. Nor will I reiterate any of the affirmative arguments I have already advanced as to why the issuance of the injunction was necessary. I will note only that for the reasons offered earlier, it is clear to me not only that the district court did not err when it issued its injunction in reliance on the relitigation exception, but also that it did not abuse its discretion when it relied on the “necessary in aid of jurisdiction” exception as well.
In reaching its decision regarding the “necessary in aid of jurisdiction” exception, the district court explained that serious issues pertaining to the implementation of the federal class settlement remained unresolved. First, the district court found that insofar as Lester claimed damages for the cost of repairing its customers’ hog barns, those customers covered by the settlement agreement would effectively become a subclass that would enjoy special treatment unavailable to other class members, specifically the double recovery of their damages. Second, the district court expressed concern that if the jury’s verdict were allowed to stand, a flock of enterprising Lester-like plaintiffs might appear in state courts around the country, seeking remuneration for claims on behalf of customers covered by the settlement agreement. The possibility of these occurrences threatened the settlement agreement because, among other reasons, there would be a risk that the agreement would no longer provide the exclusive relief for customers that the parties intended.[5] Third, the district judge found that the state court verdict, if not enjoined, would “seriously impair the integrity of this court’s Order, and directly interfere with and seriously impair my ability to supervise, implement, enforce, construe and interpret the class action settlement agreement over which I have retained exclusive jurisdiction.” These concerns are not trivial and taken together, there can be no question that they created a substantial and serious risk that the district court’s jurisdiction over the class would become “nugatory.” See Bennett, 285 F.3d at 806.
*867 The district court’s third factual finding, that the state court verdict would substantially impair its ability to supervise the settlement agreement, was made at a time when Louisiana Pacific was still very much in the process of satisfying the terms of that agreement. The majority, in its effort to make it appear as though the federal litigation was over and done with and that the district court had little if any supervision left to perform, makes much of the fact that, as of September, 2008, Louisiana-Pacific had paid approximately $509 million in satisfaction of $823 million in claims and that less than $20 million remained in valid and approved unfunded claims. However, those were not the facts before the district court when it issued its injunction in December, 2002. At that time, the final day for class members to file claims against Louisiana-Pacific had not yet arrived and the company had not yet decided whether to satisfy in full all of the remaining valid and approved unfunded claims. In fact, one mechanism for funding outstanding claims, the Claimant Offer Program, was not approved until March 24, 2003, three months after the injunction was issued. Thereafter, on June 27, 2003, the court approved a stipulation between class members and Louisiana-Pacific regarding the implementation of that program. Thus, the majority mis-characterizes the facts regarding the status of the federal litigation, which the appointed special master described as “one of the largest and most complex class action settlements ever reached in the United States.” The settlement was still at a sensitive stage and the district court acted within its discretion when it concluded that the state court action threatened its stability.
The majority disagrees with the district court’s statement of the relevant facts and its analysis of them. It premises its decision on the misguided assumption that the district court’s work was done (in which case the relitigation exception would still apply). The majority writes:
[t]he necessary in aid of jurisdiction exception is inapplicable here because the state court action did not threaten the district court’s jurisdiction over the Inner-Seal Siding litigation. By the time that the court issued the injunction, the Inner-Seal Siding class action had long since been resolved. Indeed, the district court had several years earlier approved the settlement and entered final judgment. Because the litigation was over, the state court action could not have interfered with the district court’s consideration or disposition of the class claims. Nor could it have interfered with the court’s continuing jurisdiction over the settlement. The membership of the class was fixed, the parties’ respective rights and liabilities were resolved, the settlement fund had been established and claims were being paid.
Maj. op. at 844 (internal citation omitted). In other words, the majority finds, erroneously, that the district court had, from a practical standpoint, exhausted its jurisdiction. It asserts that the class action “had long since been resolved,” and that there was, therefore, no threat to the court’s jurisdiction. It concludes, therefore, that the court was without the authority to issue an injunction under the “necessary in aid of jurisdiction” exception.
The first problem with the majority’s holding is that it is based on erroneous findings of fact improperly made by an appellate court. My colleagues miseharac-terize the status of the class action and ignore the district court’s factual findings regarding the threat that the jury verdict posed to the ongoing implementation of the complex settlement agreement. The majority holds that the “necessary in aid of jurisdiction” exception is inapplicable *868 because “the Inner-Seal Siding class action had long since been resolved[,] ... [t]he membership of the class was fixed, the parties’ respective rights and liabilities were resolved, the settlement fund had been established and claims were being paid.” Maj. op. at 844(citation omitted). That is, of course, a different view of the status of the case than the district court expressed when it determined that the jury verdict interfered with the ongoing administration of the settlement fund. It is also a different view than is revealed by an examination of the factual record. The “necessary in aid of jurisdiction” exception is inapplicable only when the district court’s jurisdiction has been so completely exhausted that the intrusion by a state court on its exercise of its jurisdiction would be meaningless. The exception is not, as the majority suggests, inapplicable simply because the district court has entered a settlement agreement that is in the process of being implemented under the active supervision of the court.
Here, although the “membership of the Inner-Seal Siding class and the terms of the settlement were approved and finalized long before the district court issued the injunction,” Maj. op. at 846, all class members’ claims had not been paid (nor had they all even been made) as of the date the injunction was issued, and the administration of the settlement was ongoing. Much remained to be done to carry out the settlement both by the parties and the court. The district court’s injunction was designed to ensure that the remaining class claims would be funded and paid, and that Louisiana-Pacific would not be required to compensate class members for the same damage, loss, or cost in another forum at any time in the future. Without the injunction, the court’s enforcement jurisdiction and the final settlement of all claims were, in the district court’s judgment, seriously threatened. Accordingly, the court had the discretion to issue the injunction under the “necessary in aid of jurisdiction” exception.
Second, the majority disregards the provision of the settlement agreement and the district court order expressly retaining “exclusive and continuing” jurisdiction over the enforcement of the settlement agreement, “including [ ] such purposes as supervising and implementation, ... construction, and interpretation of the Settlement Agreement.” In Flanagan, 143 F.3d at 540, we held that the inclusion of such a provision, establishing “exclusive” enforcement jurisdiction in the district court provides a sufficient basis for the invocation of the “necessary in aid of jurisdiction” exception. See id. at 546; see also Battle, 877 F.2d at 880-83; Am. Soc’y of Composers, 442 F.2d at 603. The reason is that the court’s jurisdiction over the settlement agreement finds its source in the express provision of the settlement agreement and court order retaining exclusive and continuing jurisdiction; it is “more than just a continuation or renewal of jurisdiction.” See Flanagan, 143 F.3d at 544 (quotations omitted). In this case, the district court included in its order exactly the kind of express provision described in Flanagan. Accordingly, the district court’s reliance upon Flanagan was not improper, and its invocation of the “necessary in aid of jurisdiction” exception was appropriate.[6]
*869 The third reason that the district court’s decision should be affirmed pursuant to the “necessary in aid of jurisdiction” exception is that the mere complexity of the settlement justifies the court’s issuance of the injunction under that exception. In re Diet Drugs, 282 F.3d 220, 236 (3d Cir.2002). The settlement agreement in the case before us, which is well in excess of a half-billion dollars, brought to a conclusion litigation that combined three nationwide class actions plus a number of similar statewide actions. The settlement agreement’s comprehensiveness is especially important because the district court and the parties invested enormous resources in its approval and enforcement. Because the settlement agreement is complex, it is especially vulnerable to state actions that may frustrate the district court’s attempt to oversee its administration, See id., 282 F.3d at 235-37 and 235 n. 12 (“It is in the nature of complex litigation that the parties often seek complicated, comprehensive settlements to resolve as many claims as possible in one proceeding. These cases are especially vulnerable to parallel state actions.... ”).
The majority disregards the complexity of this case. It asserts only that, historically-speaking, the “necessary in aid of jurisdiction” exception arose from the rule that actions in rem should be able to proceed in one jurisdiction -without interference from another. See Maj. op. at 846. Relying on Supreme Court case law from 1922, the majority concludes that the “general rule” today is that where an action is strictly in personam, there is no objection to a subsequent action in another jurisdiction. Maj. op. at 846. However, the majority fails to recognize that, despite the “general rule” against issuing injunctions in in personam actions, there is an exception for complex litigation cases. “In several cases, courts have analogized complex litigation cases to actions in rem.” In re Diet Drugs, 282 F.3d at 235-36 and 235 n. 12 (citing cases); see also Battle, 877 F.2d at 882(“it makes sense to consider this case, involving years of litigation and mountains of paperwork, as similar to a res to be administered ... This lengthy, complicated litigation is the ‘virtual equivalent of a res.’ ” (citations omitted)); In re Baldwin-United Corp., 770 F.2d at 337 (same). Thus, as the district court found, the settlement before us is akin to a res and any state court action that might interfere with that court’s oversight of it constitutes a serious threat to the federal court’s ability to manage the final stages of this complex litigation. Far from weakening the justification for the application of the “necessary in aid of jurisdiction” exception, the substantial progress of the district court proceedings in resolving this complex dispute made the threat of the Minnesota court all the more serious and made the injunction all the more necessary.
The district court found that “the Minnesota state court’s actions seriously impaired the integrity of the court’s Order, and directly interfere^] with and seriously impair[ed][the court’s] ability to supervise, implement, enforce, construe and interpret the class action settlement agreement over which [it] retained exclusive jurisdiction.” In re Louisiana-Pacific, 234 F.Supp.2d at 1180. Although, as the majority says, “the membership of the class was fixed, the parties’ respective rights and liabilities were resolved, the settlement fund had been established and claims were being paid,” the district court, aware, inter alia, of the prospect that Louisiana-Pacific could decline to continue funding the settlement, found that the risks flowing from *870 the Minnesota verdict were sufficiently serious that the court’s continuing jurisdiction over the settlement would be jeopardized. The majority arbitrarily rejects this finding. It also refuses to recognize that a double recovery for a particular subclass of the class plaintiffs constitutes a threat to the settlement agreement and the court order, and it is not willing to acknowledge the potential for harm that could result from the proliferation of state-by-state third party benefactor litigation. These potential occurrences, however, as the district court found, constitute serious and substantial threats to the exercise of the court’s jurisdiction. It was well within the discretion of the district court to reach that determination.
The majority does not offer any valid explanation as to why the consequences that would flow from entering the Minnesota jury verdict in this complex litigation do not constitute serious threats to the orderly administration of the class settlement. Although my colleagues may disagree with the district court’s decision, all of the court’s underlying findings are supported by the record, and the district judge reasonably relied upon the law of our circuit and others. The district judge did not abuse his discretion or commit clear error when he determined that the injunction should issue under the “necessary in aid of jurisdiction” exception. In fact, in my opinion, the district court did a remarkably good job with the law and reached the correct result with respect to both Anti-Injunction Act exceptions on which it relied.
V.
In conclusion, it is clear that Lester’s state law claims pursued on behalf of and for the benefit of its customers may be enjoined under both exceptions relied upon by the district judge, the relitigation exception and the “necessary in aid of jurisdiction” exception. The majority’s decision not only condones a double recovery by a sub-group of class members in direct contravention of the settlement agreement, but it encourages similar disruptive litigation in other states. Because the Minnesota jury’s verdict clearly included damages covered by the settlement, allowing it to stand would circumvent the settlement agreement and seriously impair its integrity, as well as the federal court’s ability to supervise, implement, enforce, construe, and interpret the class action settlement over which it has exclusive jurisdiction. In arriving at the determination that the injunction should issue, the district court reasonably relied upon the law of our circuit and others and made underlying findings that were supported by the evidence and which may not be disturbed by an appellate court. I would affirm.
I respectfully dissent.

. Lester obtained a total verdict of $29.6 million against Louisiana-Pacific covering all of its claims. Louisiana-Pacific does not challenge the propriety of the portion of damages that redresses direct losses that Lester itself suffered. It challenges only the award of repair costs of class members covered by the settlement agreement.

. Had the jury followed the trial judge's instructions, it would have returned a verdict of only $2 million for repair costs instead of $13.2 million. Although the jury clearly violated the trial judge’s directives," the judge declined to disturb the verdict, thus upholding the double recovery award. See Maj. op. at 850 n.27.

. Judge Silverman's concurrence asserts that “once [Louisiana-Pacific] raised its res judi-cata defense in state court and that court ruled on it,” the district court should have deferred to the state court’s ruling and thus declined to consider the relitigation exception. It is unclear to which state court ruling Judge Silverman is referring, and his implication that the state court ruled against Louisiana-Pacific on the res judicata issue prior to the district court's issuance of its injunction is wrong. In fact, the converse is true: the state court instructed the jury that the settlement agreement barred recovery for repair costs incurred during the settlement period. (Indeed, even the majority opinion acknowledges that the trial court ruled in Louisiana-Pacific's favor on the res judicata issue. See Maj. op. at 837.) The jury then returned the disputed verdict. Before the state court issued any ruling with respect to the validity of the jury's action, the federal court issued the injunction. Thus, the principal cases upon which Judge Silverman relies in his concurrence, Parsons Steel, Inc. v. First Alabama Bank, 474 U.S. 518, 106 S.Ct. 768, 88 L.Ed.2d 877 (1986), and Ramsden v. AgriBank, FCB, 214 F.3d 865 (7th Cir.2000), in both of which the state courts had expressly rejected a res judicata defense before the injunction issued are completely inapposite. Moreover, in Parsons the state court had entered its judgment prior to the federal, court injunction, a fact that was central to the Supreme Court’s ruling: "We hold, therefore, that the Court of Appeals erred by refusing to consider the pre-clusive effect ... of the state-court judgment.” 474 U.S. at 525, 106 S.Ct. 768. Here, the Minnesota court had not ruled on the legality of the jury’s verdict, let alone entered judgment, prior to the issuance of the injunction.

. The majority's assertion that Trevino is "readily distinguishable” because here there is no familial relationship between the parties in privity misses the point. In Trevino, the critical issue was not the familial relationship but rather that “the interests of Trevino and her grandmother are so similar that Trevino’s grandmother virtually represented Trevino in [the prior litigation].” 99 F.3d at 924. The facts here are fundamentally indistinguishable; Lester’s own president, testified during the state court trial that the focus of that litigation was to get each customer "what he’s entitled to.” However, as in Trevino, his customers’ interests had been fully represented in the prior federal action and were protected by the settlement agreement.

. The settlement agreement provides that "the [district] Court shall retain exclusive and continuing jurisdiction of the Action, all Parties and Settlement Class members, to interpret and enforce the terms, conditions, and obligations of this release.” In re Louisiana-Pacific, 234 F.Supp.2d at 1173 (quoting the settlement agreement) (emphasis added). Similarly, the district court order approving the agreement states that the district court retains “exclusive and continuing jurisdiction over the Actions and Parties, including all members of the Class, the administration and enforcement of the settlement, and the benefits to the Class, including for such purposes as supervising and implementation, enforcement, construction, and interpretation of the Settlement Agreement.” (emphasis added).

. In its analysis of the necessary in aid of jurisdiction exception, the majority seeks unsuccessfully to distinguish Flanagan on the ground that, in that case, disputes arising from the settlement agreement were still being litigated in federal court when the plaintiffs sought to pursue their state court claims. The majority's argument ignores the fact that in our analysis of the Anti-Injunction Act's exceptions in Flanagan we considered only the fact that the settlement agreement had conferred continuing jurisdiction; we did not *869 once mention the import of ongoing disputes in federal court. See 143 F.3d at 545-46.